J-S01020-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPT. OF: S.F., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.B., MOTHER | | No. 1244 MDA 2020 |

Appeal from the Decree Entered August 28, 2020
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s): 071-Adopt-2019

BEFORE: LAZARUS, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY McCAFFERY, J.: **FILED MARCH 02, 2021**

Appellant, H.B. a/k/a/ H.B.B. (Mother), appeals from the decree entered in the Cumberland County Court of Common Pleas, Orphans' Court, denying her petition to involuntarily terminate the parental rights of V.F. (Father) to their minor son, S.F. (Child) (born in March of 2011), under Section 2511(a)(1) and (b) of the Adoption Act.[1] We affirm.

On August 23, 2019, Mother filed the underlying termination petition, so that her husband, D.B., (Stepfather) may adopt Child. On that day, Mother also filed an adoption petition on behalf of Stepfather. On May 12, 2020, the

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 23 Pa.C.S. §§ 2101-2938.

J-S01020-21

trial court held an evidentiary hearing, at which Mother and Father, represented by counsel, testified.[2]

The trial court summarized the testimony and exhibits presented at the termination hearing as follows:[3]

> Child was born in Chambersburg, PA [in March of 2011]. He has resided with Mother since . . . birth and currently resides with Mother and Stepfather at a confidential[ ] location[. Mother's

---

[2] The trial court appointed Child's guardian *ad litem* (GAL), Katie J. Maxwell, Esquire, to serve in a dual role as his legal interests counsel, by stipulation of the parties. Trial Ct. Op., 8/28/20, at 1. In ***In re Adoption of L.B.M.***, 161 A.3d 172 (Pa. 2017) (plurality), our Supreme Court held that 23 Pa.C.S. § 2313(a) requires the appointment of counsel to represent the legal interests of any child in a contested involuntary termination proceeding. ***Id.*** at 180. The Court defined a child's "legal interest" as synonymous with their "preferred outcome." ***Id.*** at 174.

In ***In re T.S.***, 192 A.3d 1080 (Pa. 2018), the Supreme Court held the trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome. ***Id.*** at 1092. The Court explained, "[I]f the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) . . . that counsel be appointed 'to represent the child,' . . . is satisfied where the court has appointed an attorney-[GAL] who represents the child's best interests during such proceedings." ***Id.*** at 1092-93.

Here, Child was nine years old when GAL/Counsel interviewed him. We do not comment on the quality of the GAL/Counsel's representation of Child. ***See In re: Adoption of K.M.G.***, 219 A.3d 662, 669 (Pa. Super. 2019) (*en banc*) (this Court has authority only to *sua sponte* raise issue of whether the trial court appointed any counsel for the child, and not authority to delve into the quality of the representation), *aff'd*, 240 A.3d 1218 (Pa. 2020).

[3] For ease of review, we have amended the trial court's references the parties: "Natural Father" to "Father;" "H.B." to "Mother;" "D.B." to "Stepfather;" and "S.F." and "the child" to "Child."

- 2 -

address is confidential due to a Protection from Abuse (PFA) action between the parties.] At the time of his birth, [Mother and Father] were not married. Mother married Stepfather [in May of] 2019, and, if Father's parental rights are terminated, Stepfather intends to adopt Child. Father currently resides in Harrisburg, PA.

Mother and Father lived together at the time of Child's birth[,] until their romantic relationship ended in November 2013. While together, Mother worked outside the home, and Father stayed at home and was the caretaker of Child.

Following their physical separation, a child custody action was initiated in Franklin County resulting in a February 4, 2014 custody order ("controlling custody order"). The controlling custody order awarded Mother primary physical custody and the parents shared legal custody. Father's periods of partial physical custody were limited to agency supervised visitation . . . every other Saturday or Sunday from 10:00 a.m. to 5:00 p.m. In order to obtain unsupervised visits, Father was to obtain a five panel hair follicle drug test with extended opiates and proof thereof provided to Counsel for Mother and the Court. He never provided proof of this type of drug test, but had negative drug test/s that did not meet the five panel hair follicle standard.

There is a history of ancillary litigation between the parents[, including PFA] and a child support action. Father initially filed [a PFA petition against Mother], following a dispute where he alleged Mother physically assaulted him and threatened that he would not see Child again. This PFA was granted[,] according to Father[,] and shortly thereafter Mother initiated her own PFA action against Father. On July 18, 2018 a final PFA Order was entered in Cumberland County, indicating that the underlying issues from [Father], related to custody[,] visitation, and phone contact[,] are properly addressed by the Franklin County custody case.

. . . Mother initiated a support action in 2015 in Franklin County. In 2015, Father was on disability and no support was awarded. Mother again filed in Dauphin County in 2017 and as a result of Father's recent employment[,] he was ordered to pay child support and began doing so in October 2019.

Father's last physical contact with Child was in December 2016 after he arranged for and took all the necessary steps to have a one hour supervised visit at YWCA. On March [ ], 2018

Father called Child at school during school hours in order to speak to him on the phone on Child's birthday. Father was permitted to speak with Child for a very brief period of time. . . . Father also called Mother and requested to speak to Child on March [ ], 2018 with conflicting testimony as to whether the call was made in 2018 or 2017. Audio recordings of the phone calls were played at the hearing[.] Father asks Mother if he can speak to Child to wish him a happy birthday and informs her that she is being recorded. Mother responded with expletives directed at Father and stated he is not "shit" to Child. She also told Father to die in a hole somewhere. Father was held in contempt of a PFA Order as a result of calling Mother on [Child's] birthday and asking if he could speak to his son to wish him a happy birthday.

Father believes that his attempts to establish supervised visits with Child were frustrated by Mother. Pursuant to the controlling custody order, Father was permitted supervised visitation at an approved agency Saturday or Sunday from 10:00 a.m. to 5:00 p.m. every other weekend, but he was responsible to pay all costs associated with this visitation. Mother through her attorney at the time directed Father to provide Mother a $30.00 gas card so she could transport Child to and from Harrisburg from her Cumberland County residence for the supervised visit. The controlling custody order did not specify amounts or identify examples of costs that were deemed to be associated with visitation. Father felt that he was to pay the costs of visitation such as the orientation fees, which he did pay. Father did provide a gas card for the December 2016 visit[;] however, Mother claimed instead of $30.00 there was only $20.00 uploaded to the card. Mother informed the supervisor at the YWCA following the supervised visit between Father and Child that she would need a new $30.00 gas card from Father before additional visits could be scheduled. Father claimed he did what was necessary for supervised visits to be set up and for a year Mother refused to bring Child to visits. He also claimed that the verbal agreement he made with Mother's prior counsel concerning gas cards was to provide a $15.00 gas card and he believed that the initial card he provided would have resulted in a minimum of two visits, but Mother never brought Child to another supervised visit.

On or about September 18, 2015, Father received a letter from the YWCA visitation center informing [him] that he would need to meet certain requirements in order for the YWCA to set up supervised visitation. On or about January 16, 2016, Father

- 4 -

received a letter from the YMCA informing that[,] although he had completed his orientation for supervised visits in January 2015, Mother had not yet completed her orientation and[,] therefore, visits could not occur. Father also requested visits from the YWCA in March of 2018, but the YWCA declined to schedule them after Mother informed [the YWCA] there was a recent PFA violation[,] and the PFA order superseded the custody order. The YWCA prepared additional documentation that Father attended another orientation on November 15, 2018 and[,] after contact was made with Mother to set up her orientation so that visits could take place, Mother informed [the YWCA] that she required a $30.00 gas card before she would schedule or attend an orientation.

On May 9, 2017, Father reached out to Mother via Facebook messenger asking that she have Child call him and provided a telephone number where he could be reached. Mother's response message was "Don't contact me! You have no son." Father also set up visits at the ABC House located in Cumberland County on or around September 2019, but Mother did not complete the necessary orientation to permit visits to be scheduled.

Father was unable to comply with the five panel hair follicle drug test as required by the controlling custody order in order to obtain unsupervised visitation, but his hair was never long enough to allow the test to be performed. Father indicated that he had regular drug testing performed in order to maintain his commercial driver's license. In addition, on or around June 2014, Father submitted to drug testing at the hospital that was negative for all substances[,] and he attempted to provide this to Mother's prior counsel[,] but it was not accepted because it did not meet the five panel hair follicle standard.

Stepfather and Mother have been in a romantic relationship for almost seven years. They were married [in May of] 2019, and, in addition to Child, their household consists of a 14 year old child and 12 year old child of Mother, who are presumably Child's half siblings. Stepfather has known Child since late 2013, early 2014[,], teaches Child sports[,] and supports him emotionally, physically and spiritually. S.F. does not talk about Father. Mother explained that Stepfather would like to adopt Child. Stepfather did not testify or appear at the hearing.

Child's counsel [stated] that Father only had one in person contact with Child since January 2014 (supervised visit at the

YWCA). He did not send any birthday or Christmas cards or presents to Child when he did know Child's address. He did not file any custody modification petitions after 2016[,] as he explained that whenever he did initiate any litigation in order to obtain custody rights over Child[,] Mother would make up allegations about Father related to her older daughters[,] such as abuse or inappropriate behavior. Counsel for Child had discussions with Child demonstrating he was well adjusted and could communicate freely. He did inform [the court] that he wanted to be adopted by [Stepfather], and he wanted his last name to be consistent with his mother and step-father's last name. He explained that he had not seen his Father in a long time. Child's counsel had concerns about the contentious relationship between the natural parents and the [PFA] litigation. However, considering all the circumstances she felt that the Father's rights should be terminated.

Trial Ct. Op., 8/28/20, at 1-6 (unpaginated) (paragraph breaks added).

On August 28, 2020, the trial court entered its decree and opinion denying Mother's termination petition. The court found Mother established the statutory grounds under Section 2511(a)(1) but, regarding Section 2511(b), she "has not met her burden to establish that severing Father's parental rights would best serve Child's developmental, emotional, and physical needs." Trial Ct. Op. at 8, 10.

On September 28, 2020, Mother timely filed a notice of appeal, accompanied by a concise statement of errors complained of appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother raises the following two issues:

A. Did the trial court err in refusing to grant the petition for termination of parental rights when it did not conduct the necessary analysis to determine the best interest and welfare of the child?

B. Did the trial court err in determining there was insufficient evidence to find that granting the termination was in the child's best interest?

Mother's Brief at 3.[4]  We will review these issues together, as they are interrelated.

We first note the relevant standard of review:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record."  "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion."  "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will."  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights.  *See* 23 Pa.C.S. § 2511.  It requires a bifurcated analysis:

---

[4] Mother concedes she stated her issues somewhat differently in her concise statement.  Mother's Brief at 3 n.2.  We find the issues sufficiently preserved for review.  *See* Mother's Concise Statement of Matters Complained of on Appeal, 9/28/20 ("1. The trial court erred in concluding that there was insufficient best interest evidence to terminate parental rights.  2. The trial court erred by derogating its duty to determine the best interest of the child before denying the petition to terminate parental rights.").

Mother does not challenge the court's determinations with regard to Section 2511(a) — which were in her favor.  Nevertheless, we will discuss Section 2511(a)(1) to the extent it bears upon the trial court's findings concerning Section 2511(b).

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Here, Mother sought termination under only Section 2511(a)(1) and (b),

which provides as follows:

> **(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > \* \* \*
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

*See* 23 Pa.C.S. § 2511(a)(1), (b).

With respect to Section 2511(b), we consider whether termination of parental rights will best serve Child's developmental, physical and emotional needs and welfare. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.* "[A] parent's basic constitutional right to the custody and rearing of. . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

"Intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). "'Above all else . . . adequate consideration must be given to the needs and welfare of the child.' A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re Z.P.*, 994 A.2d at 1121.

First, Mother asserts the trial court's reliance on *In re Santelia*, 465 A.2d 21 (Pa. Super. 1983), and *In re T.L.G.*, 505 A.2d 628 (Pa. Super. 1986), is misplaced, because those decisions rested on Section 2511(a), not section 2511(b). Mother's Brief at 9-11. We note the trial court discussed those cases as follows:

> This court's next analysis requires a detailed inquiry into whether termination is in the best interests of the child as

> specified by 23 Pa.C.S. § 2511(b). . . . Even where it is established that a parent has failed to perform parental duties for a period in excess of six months, such a finding does not, in and of itself, support an order terminating parental rights. [*In re Santelia*, 465 A.2d at 23.] Rather, the trial court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of the circumstances, clearly warrants permitting the involuntary termination of said parent's parental rights." *In re T.L.G.*, 505 A.2d [at 629-30.] In *In re T.L.G.*, [the] natural mother was seeking to terminate [the] natural father's rights. [The n]atural father had no contact with the children for two years prior to the termination petition other than occasional gifts and attempted phone calls. [The m]other would not allow the phone calls. The Superior Court held that [the] natural father was prevented from being a parent rather than choosing not to be one.

Trial Ct. Op. at 8-9. We conclude the court's discussion was proper.

This Court has emphasized a trial court must consider the totality of the circumstances in assessing the evidence in relation to Section 2511(b). *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008).

> In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case. . . .
>
> . . . The trial court should also examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent.

*Id.* at 762-63.

The trial court was aware of its duty to conduct an analysis of the facts in evidence with regard to Section 2511(b). The court did not inappropriately apply cases decided under Section 2511(a)(1) to its Section 2511(b) analysis. The trial court did not misconstrue either *Santelia* and *In re T.L.G.* Rather,

- 10 -

the court appropriately cited those cases for the proposition that, in deciding whether to terminate parental rights, the court must examine the totality of the circumstances and be mindful of the emotional impact that termination of parental rights causes the subject child. *See Santelia*, 465 A.2d at 23; *In re T.L.G.*, 505 A.2d at 629-30.

Next, Mother asserts the trial court erred in failing to engage in a best interest analysis before denying her petition, and in determining there was insufficient evidence to find termination of Father's parental rights would be in Child's best interest. Mother's Brief at 7. Mother claims the court improperly "construed the welfare analysis to be an additional requirement" for her to meet. *Id.* at 9. Mother further asserts the court incorrectly "presumed there was a default position . . . to deny the petition to terminate." *Id.* at 15. She reasons:

> The court did not find that refusing to terminate Father's parental rights best served Child's interest. Instead it found [Mother] had not met her burden. However as . . . case law shows and the statutory language suggests[,] the burden at this second step does not lie with the petitioner to prove the best interest of the child, it lies with the court to determine the effect of severing the bond on the welfare of the child.

*Id.* at 16. Mother contends she produced evidence that it was in Child's best interest to sever any bond with Father, whereas Father failed to produce any evidence of a bond between him and Child. We determine no relief is due.

Although Mother does not challenge the trial court's findings under

Section 2511(a)(1), we consider them as context for the court's

determinations under Section 2511(b). The court found:

> At the [May 12, 2020,] hearing, no party refuted that Father last saw Child in December 2016. Father did however, present evidence of his attempts to exercise his custodial rights[, including] attendance at orientations to allow for supervised visits[.] There was also evidence that Mother required a $30.00 gas card [before] a visit [could] be scheduled. While this seems unreasonable on its face and was clearly a stretch from the ambiguous language of the controlling custody order regarding payment of costs associated with visitation, Father did nothing to challenge this or the fact that Mother was clearly not abiding by the controlling custody order by failing to attend her orientations. There was also evidence that Father attempted to contact his son on his birthday in March 2018 by telephone. [These calls] were met with blatant and spiteful refusal from Mother.
>
> While the court finds Mother placed regular barriers up to prevent contact and communication between Child and Father, Father did little to attempt to overcome these barriers. He did not seek to modify the custody order or any other redress when Mother would fail to complete orientation or refuse his attempted telephone contact. A parent must demonstrate a "sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise 'reasonable firmness' in resisting obstacles placed in the path of maintaining the parent-child relationship." *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003) . . . .
>
> It is also evident that Mother utilized the legal process as a sword instead of a shield in terms of keeping Father at bay from his child and ultimately removing him from her personal dealings. Regardless of her actions, Father's inactions speak louder in this termination matter. As the Superior Court held . . ., parental rights will not be preserved simply to allow for a "more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her immediate physical and emotional needs." *In re Adoption of Godzak*, 719 A.2d 365, 368 (Pa. Super. 1998).

- 12 -

Almost three years elapsed between the December 2016 supervised visit and the August 2019 filing of the petition to terminate parental rights. Father made few if any genuine attempts to see Child during that time frame, let alone the six months prior to the filing of the petition. Father's inaction cannot be reasonably justified based upon the barriers placed upon him by Mother as there was no evidence that he sought to modify the custody order or initiate contempt proceedings for Mother's failure to attend orientations at any time prior to the filing of the petition. Therefore, the court finds that [Mother] has established Father meets the statutory requirements set forth in Section 2511 (a)(1) as Father failed to perform parental duties for at least six months prior to the filing of the petition.

Trial Ct. Op. at 7-8.

With respect Section 2511(b), the trial court's opinion did not focus on the existence of any bond between Father and Child. Instead, the court found:

[T]he record is insufficient to establish that it is in the best interest of Child for Father's rights to be terminated. . . .

[Mother] did not present testimony from Stepfather . . . . Therefore, the court was unable to evaluate Stepfather's perception of his involvement with ensuring that Child's emotional, physical, intellectual and developmental needs are being met. Similarly absent from the record was information regarding Child's feelings about and relationship with D.B. Although Child indicated to his counsel that he wanted to be adopted by Stepfather, this was also coupled with the fact that he wanted the same last name as his mother and Stepfather. There was insufficient evidence presented as to the interactions between Stepfather and Child[,] as Mother only provided a short summary of things Stepfather does for Child. Moreover, there was simply no evidence of Stepfather's commitment to parenting and providing for Child long term or[,] in other words[,] his understanding of the responsibilities required of an adopting parent. Without this critical information, the court is unable to find that termination serves the best interest of Child. Therefore, the Petition for Involuntary Termination of Parental Rights is DENIED.

\* \* \*

[FN] This decision should serve as a wake-up call for Father. While the court recognizes that the legal process can be overwhelming and complex for those who are unfamiliar with it, Father cannot wait around to perform his parental duties and expect that his parental rights will forever be preserved. Father should recognize that termination was not granted because the record was incomplete with regard to being able to determine that termination is in the best interest of Child. This is not a static finding and should [Mother] subsequently petition the court and offer necessary best interest evidence, the outcome could result in termination of parental rights.

Trial Ct. Op. at 8-10 & n.3 (one footnote omitted and paragraph breaks added).

Pursuant to Section 2511(b), the trial court properly considered whether termination of parental rights will best serve Child's developmental, physical and emotional needs and welfare. *See In re Z.P.*, 994 A.2d at 1121. The court found Mother had not demonstrated with sufficient evidence that termination of Father's parental rights, and adoption by Stepfather, would provide for Child's needs and welfare, and his love, comfort, security, and stability. The trial court reasoned that, although Mother testified about the life Stepfather could provide for Child, Mother had not presented any testimony from Stepfather regarding his prospective adoption of Child. *In re N.A.M.*, 33 A.3d at 103.

Our Supreme Court has instructed:

[T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are

observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In the Interest of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

After careful review, we find the trial court's credibility and weight determinations are supported by competent evidence in the record, and, thus, we will not disturb them. *See Interest of S.P.*, 47 A.3d at 826-27. As the court concluded Mother failed to support her claim that the termination would be in Child's best interests with sufficient testimony or other evidence, we affirm the decree denying her petition to terminate Father's parental rights.[5]

Decree affirmed.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/02/2021

---

[5] We note the trial court cautioned Father he still has work to do in assuming his role as a parent.